**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 26-cr-20164-BLOOM**

UNITED STATES OF AMERICA

v.

JAVAROUS LASHAY MCNEALY,

Defendant.
_____________________________________/

**ORDER ON MOTION TO SUPPRESS**

**THIS CAUSE** is before the Court on Defendant Javarous Lashay McNealy's ("Defendant") Motion to Suppress, ECF No. [20] ("Motion"). The United States of America (the "Government") filed a Response in Opposition, ECF No. [30], and Defendant filed a Reply, ECF No. [39]. The Court held a hearing on September 30, 2026, which was continued to October 13, 2026, and has considered the testimony and evidence presented during that hearing. ECF Nos. [46] and [56]. The Court has reviewed the Motion, the opposing and supporting briefs, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, Defendant's Motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

On April 6, 2026, Defendant disembarked from a cruise ship at the Port of Miami. ECF No. [20] at 1; ECF No. [30] at 1. After presenting his unexpired Florida driver's license and Florida birth certificate, Defendant was referred for secondary inspection by U.S. Customs and Border Protection ("CBP"). *Id.* Officer Otniel Bovi ("Officer Bovi") brought Defendant into a private room for additional questioning. *Id.*

Officer Bovi testified that a very small percentage of arriving passengers are selected for secondary inspection. ECF No. [55] at 8:4. For ships carrying 2,000 to 8,000 passengers, approximately 20 or 25 subjects are selected for secondary inspection. *Id.* at 8:4–7. Of those, approximately 10 passengers are randomly selected, and the rest are selected based on specific "derogatory" information known about them that renders them a person of interest. *Id.* at 7:11–25, 8:1–17. During secondary inspection, CBP searches, among other things, electronic devices if the subject has derogatory information about him in CBP's records or if the subject otherwise gives CBP a reason to inspect the electronics. *Id.* at 8:22–25, 9:1. In Defendant's case, he was referred for secondary inspection based on derogatory information about him in CBP's system, also referred to by Officer Bovi as a "lookout." *Id.* at 9:2–7. Specifically, there was a "lookout," generated by a national law enforcement agency, that Defendant was a possible purchaser of child sexual abuse material ("CSAM"). *Id.* at 30:20–24, 31:12–18.

Defendant arrived at primary inspection around 9:30 a.m. and was taken into a waiting room associated with secondary inspection a few minutes later. *Id.* at 9:21–23. Officer Bovi testified that, during the secondary inspection, his intention was to interview Defendant and inspect his electronics due to information in CBP's system that Defendant was purchasing or viewing CSAM. *Id.* at 10:17–23. Officer Bovi testified that Defendant was not free to leave and could not refuse the secondary inspection. *Id.* at 34:18–22. As Defendant arrived at the secondary inspection waiting area, a CBP officer took his luggage to conduct a search and to retain it—that is, Defendant was separated from his luggage. *Id.* at 35:20–25, 36:1–10.

After several minutes in the waiting room, Defendant was taken to an interview room. *Id.* at 11:1–14. The door to the room was open, *id.* at 11:18–23, and Defendant was not physically restrained, *id.* at 12:12–14. After asking Defendant introductory questions, Officer Bovi asked

Defendant about his employment, payment platforms, and social media usage. *Id.* at 13:6–25, 14:1–4. Officer Bovi asked about Defendant's electronic devices. *Id.* at 14:3–4. Defendant was also asked whether anyone on the ship enlisted him to bring contraband into the United States, with child pornography used as an example of contraband. *Id.* at 39:20–25, 40:1–8. Officer Bovi testified that these were normal questions asked during a CBP secondary interview. *Id.* at 15:1–4.

During the interview, Officer Bovi showed Defendant a tear sheet relating to CBP's authority and individual rights regarding the inspection of electronics. *Id.* at 16:9–21. The tear sheet states:

> Travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for the examination of the device and its contents. Failure to assist CBP in accessing the electronic device and its contents for examination may result in detention of the device in order to complete the inspection.

ECF No. [57-1].

Officer Bovi testified that for information on an electronic device to be accessible, a traveler must provide his or her passcode. ECF No. [55] at 45:15–18. After Defendant reviewed the tear sheet, Officer Bovi asked Defendant if he would provide his phone's passcode, which Defendant did. *Id.* at 19:9–16. Officer Bovi testified that he asked for the passcode so that he could search Defendant's phone for CSAM. *Id.* at 19:18–21.

After his interview with Officer Bovi, Defendant returned to the waiting room. *Id.* at 22:1–3. He still did not have his luggage, phone, backpack, or car keys available to him. *Id.* at 48:1–9. Over the next 40 minutes, Officer Bovi searched Defendant's phone for CSAM. *Id.* at 22:8–20. After locating CSAM on Defendant's phone, Officer Bovi notified his supervisor and contacted Homeland Security Investigations ("HSI"). *Id.* at 23:1–4.

HSI Special Agent Cameron Dwyer ("Agent Dwyer") arrived and conducted a second interview of Defendant, asking questions designed to establish rapport with Defendant. *Id.* at 65:1–4. During the interview, Agent Dwyer said to Defendant, "We'll wrap this up quick, I promise, and get you out of here." *Id.* at 85:6–8. He then asked Defendant to read aloud and thereafter sign a *Miranda* waiver form, which Defendant did. *Id.* at 66:18–24. Later during the interview, Agent Dwyer told Defendant that "honesty will help you," *id.* at 70:13–17, and "right now, I'm really trying to help you," ECF No. [58] at 10:56–10:59. Agent Dwyer also stated, "Honesty will help. I can talk to people and we can figure this out." ECF No. [55] at 72:8–11. He reiterated, "We'll get you out of here." *Id.* at 92:7–12. The interview lasted between 45 minutes and an hour. *Id.* at 72:12–14. Following Agent Dwyer's statements, Defendant admitted possessing CSAM. ECF No. [20] at 5.

On April 23, 2026, Defendant was charged by Indictment with two Counts: Transportation of Visual Depictions Involving Sexual Exploitation of Minors, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1) (Count I) and Possession of Visual Depictions Involving Sexual Exploitation of Minors, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Count II). ECF No. [9].

In August 2026, Defendant filed the Motion, requesting that the Court "suppress the evidence discovered on [Defendant]'s phone and [Defendant]'s statement, including the passcode to his phone, and fruits derived therefrom, which was unlawfully compelled from [Defendant] by law enforcement." ECF No. [20] at 1.

## II. LEGAL STANDARD

In a suppression hearing, "the burdens of production and persuasion generally rest upon the movant[.]" *United States v. Lincks*, No. 09–60187–CR, 2009 WL 3256745, at *3 (S.D. Fla. Oct. 7, 2009) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)). The

movant must show that suppression is warranted by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 (1974). Moreover, "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (citing *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977)).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. As a general matter, warrantless searches are illegal under the Fourth Amendment. A*ndre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1301 (11th Cir. 2025) (citing *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021)). If a defendant produces sufficient evidence showing that he was "subjected to a search without a warrant, the burden shifts to the government to justify the warrantless . . . search." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

The Fifth Amendment states, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Specifically, the individual in custody must be advised—prior to interrogation—that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id.* at 467–73. A custodial interrogation is defined as "questioning initiated by law enforcement

officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

Regardless of whether a *Miranda* warning is required, "the court must still rule on the confession's voluntariness." *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (citations omitted). The Fifth Amendment prohibits use in trial of both an individual's compelled statements *and* the "evidence derived directly and indirectly therefrom." *Kastigar v. United States*, 406 U.S. 441, 453 (1972). The Government bears the burden of proving that a challenged statement is voluntary. *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citation omitted).

## III. DISCUSSION

### A. Fourth Amendment Claim: Search of Defendant's Phone

Defendant's first argument is that the search of his phone violated his Fourth Amendment rights. ECF No. [20] at 6. Defendant contends the Government lacked probable cause, did not have a warrant, and had no reasonable, articulable suspicion before seizing and searching Defendant's phone. *Id*. Defendant "recognizes that the Eleventh Circuit has held that the search of electronic devices at the border is routine, and therefore an individual has no Fourth Amendment protection in his electronic devices at the border." *Id*. at 7 (citations omitted). He therefore seeks to preserve the issue for further review. *Id*.

The Government responds that Defendant's argument is foreclosed by binding precedent. ECF No. [30] at 4–5. That is, the Eleventh Circuit has rejected the claim that border searches of phones violate the Fourth Amendment. *Id.* at 5.

Defendant replies that he continues to preserve his arguments that "(1) he has Fourth Amendment protection in his electronic devices; (2) law enforcement needed and did not have probable cause and a warrant to seize and search his devices; and (3) law enforcement lacked reasonable suspicion to seize and search his devices." ECF No. [39] at 1.

The Eleventh Circuit has repeatedly rejected the argument that searches of electronic devices at the border require either a warrant or probable cause. *See, e.g.*, *United States v. Vergara*, 884 F.3d 1309, 1312–13 (11th Cir. 2018). It explained, "Border searches 'never' require probable cause or a warrant. And we require reasonable suspicion at the border only 'for highly intrusive searches of a person's body such as a strip search or an x-ray examination.'" *Id.* (cleaned up and quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010)). Indeed, in *United States v. Touset*, the Eleventh Circuit stated, "The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we." 890 F.3d 1227, 1233 (11th Cir. 2018). *Vergara* and *Touset* foreclose Defendant's argument. *See also United States v. Pulido*, 133 F.4th 1256, 1274 (11th Cir.), *cert. denied*, 146 S. Ct. 396 (2025) ("And even more specifically, and more relevantly here, we have held that 'the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.'" (citation omitted)). Accordingly, the Court finds that Defendant's Fourth Amendment rights were not violated.

**B. Fifth Amendment Claim: Phone Passcode Given to Officer**

Defendant contends that his statement disclosing his phone passcode to CBP officers was not voluntary and should therefore be suppressed as violative of his Fifth Amendment right against self-incrimination. ECF No. [20] at 7–8. The Government responds that Defendant's argument fails for three reasons: (1) the "regulatory regime exception," which carves out from the Fifth Amendment's protection those situations arising pursuant to a non-criminal regulatory regime, applies, (2) the questioning of Defendant was routine border questioning, which does not produce "compelled" speech, and (3) the inevitable discovery exception applies, as CBP would have accessed the contents of Defendant's phone regardless of him sharing his passcode. ECF No. [30] at 5–14. Defendant replies that the statement disclosing his passcode was a testimonial statement, as he was not randomly selected for secondary inspection but was specifically picked based on suspected criminal activities. ECF No. [39] at 1–2. Further, Officer Bovi's questioning of Defendant was custodial, not routine questioning, *id.* at 2–5, and the Government cannot meet its burden of showing the statement was voluntary, *id.* at 5–7. Moreover, the inevitable discovery exception does not apply where the Government was not actively pursuing lawful means to obtain the same information at the time of the illegal act. *Id.* at 7–8.

The Fifth Amendment's protection is violated when "the accused is compelled to make a testimonial communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976). In effect, to invoke the Fifth Amendment's protections, three elements must exist: (1) compulsion; (2) a testimonial communication or act; and (3) incrimination. A communication may be deemed incriminating—and therefore privileged—even if it is not directly inculpatory so long as the information conveyed may "lead to incriminating evidence." *Doe v. United States*, 487 U.S.

201, 208 n. 6 (1988). And a communication is testimonial if it "requires [an individual] to disclose the contents of his own mind." *Curcio v. United States*, 354 U.S. 118, 128 (1957).

There is little doubt that Defendant's statement of his passcode was testimonial and incriminating. Courts routinely find that the statement of a phone passcode is testimonial. *See, e.g.*, *United States v. Mendez-Bernal*, No. 3:19-CR-10-TCB, 2020 WL 5494728, at *2 (N.D. Ga. Sept. 11, 2020); *United States v. Hearst*, No. 1:18-CR-054-RWS-AJB, 2022 WL 16832834, at *21 (N.D. Ga. Mar. 10, 2022), *report and recommendation adopted*, No. 1:18-CR-54-RWS, 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022). Similarly, Defendant's communication of his phone passcode was certainly incriminating, as it led CBP to uncover the CSAM in his possession. *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 267 (1983) (Marshall, J., concurring) (incriminating evidence includes that which "may aid in the development of other incriminating evidence that can be used at trial" (citation omitted)). Thus, the remaining question is whether the statement of the passcode was voluntary or compelled.

In assessing voluntariness, a court must examine "the totality of the circumstances." *Lall*, 607 F.3d at 1285 (citation omitted). That is, the Court considers, among other things, "the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Eleventh Circuit in *United States v. Spivey* indicated that relevant factors in assessing voluntariness include: (1) the defendant's custodial status, (2) the presence of coercive police procedure, (3) the extent and level of the defendant's cooperation with police, (4) the defendant's awareness of his right to refuse to consent to the search, (5) the defendant's education and intelligence, and (6) the defendant's belief that no incriminating evidence will be found. 861 F.3d 1207, 1213 (11th Cir. 2017) (citation omitted). Fundamentally, the analysis must center on whether the defendant "made an independent and informed choice of his own free will, possessing

the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (citation omitted).

Here, an analysis of the factors identified by the Eleventh Circuit in *Spivey* reveals that Defendant's provision of his passcode was voluntary. The Court begins with the first factor—Defendant's custodial status. It is true that a custodial setting contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. A person is in custody if there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984) (cleaned up and citation omitted).

In *United States v. Moya*, the Eleventh Circuit elucidated the factors that a court should consider in assessing whether an individual is in custody—namely, whether "(1) 'he was not physically moved or restrained by officers during the interview,' (2) 'no handcuffs were employed and no guns were drawn,' (3) 'he was not booked or told of formal accusations, nor told that he was under arrest,' (4) 'he did not ask to leave and was not told that he was not free to do so,' and (5) 'he made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately.'" *United States v. Willoughby*, No. 11-CR-0280, 2011 WL 13136957, at *9 (N.D. Ga. Oct. 21, 2011) (citations omitted); *see also United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). In *Moya*, the Eleventh Circuit concluded that "a secondary interview is part of the border routine" and does not implicate custody concerns. 74 F.3d at 1120 (citation omitted). In such cases, "questioning at the border must rise to a distinctly accusatory level" before it can be said that the individual is "in custody." *Id.*

A review of the *Moya* factors reveals that Defendant was not in custody. He was not physically restrained by Officer Bovi or any other officer, nor was he physically moved into the

interview room. ECF No. [55] at 12:10–16. No handcuffs were used, displayed, or threatened, and no guns were drawn. *Id.* at 12:20–25, 13:1–3. Defendant was not told that he was being booked, investigated for a crime, or placed under arrest. *Id.* at 15:16–25, 12:1–8. Defendant did not ask to leave, nor was he told that he could not do so. *Id.* at 15:11–21, 53:18–22. Finally, Defendant did not make any admissions that would have led a reasonable person in his place to conclude that he would be arrested immediately. Defendant answered basic biographical questions about himself, the purpose of his travel, and the ways in which he used his phone. *Id.* at 13:6–25, 14:1–4. Defendant did not admit to any criminal activity, nor was any criminal activity discussed. *Id.* at 15:24–25, 15:1–8; *see United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) ("The substance of the questioning was not accusatory; Customs agents simply inquired as to why McDowell was in the seaport, but did not ask him about the cocaine found in the container."). In effect, all five *Moya* factors counsel in favor of only one conclusion—Defendant was not in custody. And the limited exception *Moya* recognized for when custody might exist during a secondary inspection—when questioning "rises to a distinctly accusatory level"—did not exist here, as Defendant was not told he was being investigated for a crime, was not asked if he had committed a crime, and was not asked about any specific criminal history. ECF No. [55] at 15:24–25, 15:1–8.

With Defendant's non-custodial status established, the Court turns to the remainder of the *Spivey* factors. The second factor—the presence of coercive police pressure—simply did not exist here. As a general matter, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a

confession." *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994). None of those factors existed here. The interview with Officer Bovi lasted five to seven minutes. ECF No. [55] at 21:24–25. No physical force or threats were used at any point during the interview. *Id.* at 12:10–25, 20:4–9. And there is no indication on the record that Officer Bovi made promises in exchange for Defendant's provision of his passcode.

The third *Spivey* factor—the extent and level of the defendant's cooperation—indicates voluntariness, as Defendant was broadly described as "relaxed" and "cooperative." *Id.* at 12:8–10.

The fourth *Spivey* factor—the defendant's awareness of his right to refuse to consent—does not move the needle one way or another, as Officer Bovi never indicated that refusal would result in adverse consequences beyond the detention of the phone, and Defendant did not ask about his right to refuse or otherwise indicate that he did not want to answer Officer Bovi's questions. *Id.* at 15:5–13, 19:24–25, 20:1–3.

The fifth *Spivey* factor—the Defendant's education and intelligence—counsels in favor of finding voluntariness, as Defendant's Reply describes the Defendant as "educated," noting that "there is no indication that he is unintelligent." ECF No. [39] at 6.

Finally, the sixth *Spivey* factor—the Defendant's belief that no incriminating evidence will be found—tilts in Defendant's favor, as he was presumably aware that incriminating evidence could be found on his phone.

However, the weight of the *Spivey* factors allows for only one conclusion—that Defendant's provision of his passcode was voluntary. Custody is often key to the voluntariness analysis. *See United States v. Patane*, 542 U.S. 630, 645 (2004) (Souter, J., dissenting) ("*Miranda* rested on insight into the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it."). And the

absence of custody undercuts a finding of involuntariness. *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (explaining that it is "unlikely" that a non-custodial "interview . . . would give rise to a similar impression" that confession is required as an arrest). Moreover, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Connelly*, 479 U.S. at 167. Coercion is typically not found absent an excessively long interview, physical force, threats, or promises, *Jones*, 32 F.3d at 1517, none of which existed here.

Moreover, Defendant did not invoke his Fifth Amendment right against self-incrimination, which is fatal to his first Fifth Amendment claim. The Eleventh Circuit has explained that "[o]rdinarily, to claim the protections of the Fifth Amendment, an individual must actually invoke the right not to make statements, or his answers will not qualify as '"compelled" within the meaning of the Amendment.'" *McKathan v. United States*, 969 F.3d 1213, 1224 (11th Cir. 2020) (citation omitted). It is true that the Supreme Court has identified certain "self-executing" circumstances in which "an individual need not expressly invoke the right for his statements to be suppressed in a later criminal proceeding." *Id.* (citations omitted). Specifically, to date, it has identified three such circumstances: the custodial setting (unless the subject has waived his right to remain silent), limited tax-return-filing circumstances, and "situations where the government imposes a penalty if the speaker invokes the privilege to remain silent[.]" *Id.* (citations omitted).

None of those self-executing circumstances existed here. Defendant was not in custody, certainly this was not a tax-return-filing scenario, and there is no indication that the Government would impose a penalty for Defendant's invocation of his right to remain silent. Indeed, a "penalty," as contemplated by the Supreme Court, must be "substantial" to render the Fifth Amendment self-executing; it must involve the Government "threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'"

*Murphy*, 465 U.S. at 434 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)). Here, Officer Bovi testified that Defendant would not have been arrested or detained longer if he refused to provide his passcode. ECF No. [55] at 15:16–21, 18:23–25, 19:1–6. At most, had Defendant refused to provide his passcode, the device likely would have been detained for further inspection. *Id.* at 20:10–19. There is simply no indication of a "substantial" penalty for noncooperation sufficient to render the Fifth Amendment self-executing. Thus, Defendant's Fifth Amendment claim would fail in any event by virtue of his failure to invoke the relevant right.

The Court addresses two remaining arguments from Defendant. First, Defendant contends that the tear sheet, by asserting Defendant's assistance as obligatory, stripped Defendant of his choice so significantly as to render his provision of his passcode obligatory. ECF No. [20] at 9. The tear sheet states as follows:

> Travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for the examination of the device and its contents. Failure to assist CBP in accessing the electronic device and its contents for examination may result in detention of the device in order to complete the inspection.

ECF No. [57-1]. Drawing from Fourth Amendment case law, Defendant argues that when law enforcement claims authority that it lacks, the situation is "instinct with coercion—albeit colorably lawful coercion." ECF No. [39] at 5 (citing *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).

While Defendant contends that the language of the tear sheet is tantamount to demanding a passcode, a review of the tear sheet language does not support that argument. The Eleventh Circuit and Supreme Court have not directly addressed how the words on a Government form should be interpreted. Thus, the Court looks to other circuits and analogous contexts. In *United States v. Sarwari*, the Fourth Circuit looked to ordinary dictionary definitions in interpreting the language of a Government form. 669 F.3d 401, 408 (4th Cir. 2012). The court further focused on

what a person of "ordinary intellect" would believe certain terms to mean based on the "context" of the form. *Id.* (citation omitted). In *United States v. Good*, the Fourth Circuit explained that the "intent" of a question or statement on a form does not control; instead, the actual "language" of the form controls. 326 F.3d 589, 592 (4th Cir. 2003). In *United States v. Culliton*, the Ninth Circuit explained that questions on a Government form are best interpreted in "context," paying attention to "extrinsic evidence relevant" to the subject's understanding of the form. 328 F.3d 1074, 1079 (9th Cir. 2003). The Fifth Circuit in *United States v. Arellano-Banuelos* explained that "officer statements must be interpreted in context." 927 F.3d 355, 362 (5th Cir. 2019).

Using those cases for guidance, the Court concludes that the form did not obligate Defendant to provide his passcode but merely to provide his electronic device in a condition that allowed for examination of its contents. As Agent Anthony Blackman testified, the contents of phones are generally accessible even when a passcode is not provided, especially when the phone is in "after first unlock" mode. Thus, the tear sheet did not obligate Defendant to do anything beyond providing his phone in a condition that allowed the device and its contents to be examined.

Moreover, even if the tear sheet is understood as "obligating" a traveler to provide his passcode in one sentence, that statement must be understood in "context," and the sentence that follows qualifies the obligation in a meaningful way. *Arellano-Banuelos*, 927 F.3d at 362. The tear sheet advises what will occur if a traveler fails to assist CBP in accessing the device—specifically, that the device may be detained for inspection. ECF No. [57-1]. In that regard, the tear sheet contemplates travelers *not* providing their passcode and explains precisely what will happen if the traveler fails to assist in accessing the electronic device. The tear sheet communicates a choice. And insofar as the "penalty" for failing to assist—the detention of the phone—is not "substantial," it cannot be said to be coercive. *See United States v. Gavino*, No. 22-CR-136 (RPK), 2024 WL

85072, at *9 (E.D.N.Y. Jan. 7, 2024) (explaining that there is no coercion where an officer threatened to detain a subject's phone if he did not provide the phone's passcode, as the defendant "made no argument as to why doing so would have been legally improper"). Indeed, the Eleventh Circuit has held that there is no constitutional violation where police announce alternate investigative paths they may take in the absence of a defendant's cooperation. *See United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (finding consent to search was not coerced where defendant was told if he did not consent, officers would have to secure the house and apply for a search warrant); *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989) ("Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion [as] Long was free to force the agents to obtain a search warrant[.]"). Based on the above, the tear sheet is not a substantially coercive force.[1] Thus, the Court finds that Defendant's disclosure of his phone passcode was voluntary.

Defendant also argues that binding precedent establishes that Defendant was in custody because he was separated from his luggage. In *United States v. McCain*, the Fifth Circuit explained that where an individual is "able to leave only if she was willing to abandon her luggage, . . . this itself is a sufficient restriction on one's freedom of action so as to trigger the giving of *Miranda*

---

[1] This analysis also clarifies why *Bumper* does not support Defendant's argument. In *Bumper*, the Supreme Court explained that consent to a search is not voluntary where it is "no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 549. Moreover, the Supreme Court stated:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id.* at 550. However, this rationale has not been applied outside of the Fourth Amendment context. Moreover, even if the tear sheet's first sentence is interpreted to obligate provision of a passcode, the context of the first sentence makes clear that a subject may decline to provide a passcode, and CBP may detain the phone for inspection instead.

warnings before proceeding with any interrogation." 556 F.2d 253, 255 (5th Cir. 1977). However, the Eleventh Circuit has since retreated from a strict interpretation of *McCain*, explaining that in certain circumstances, even if one is separated from their luggage, a secondary inspection still does not require a *Miranda* warning or constitute custody. *United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011).

The Court finds *Jayyousi* more analogous and instructive than *McCain*. In *McCain*, the traveler was subjected to a strip search and was subsequently interviewed for ten minutes while her luggage was being searched, at which point she confessed to smuggling narcotics. 556 F.2d at 254. In light of this, the question facing the court was whether the custodial status established by the strip search *continued* during the interview. *Id.* at 255. By contrast, in *Jayyousi*, the traveler was taken to secondary inspection, was not physically or otherwise restrained, and was asked questions about his background and travels. 657 F.3d at 1109. He did not ask to leave or speak to an attorney, even when challenged about the amount of money he brought into the country as compared to the amount declared, and then the agent took a break. *Id.* at 1109–10. Following the break, the agent confronted the traveler with criminal accusations. In applying the *Moya* factors, the Eleventh Circuit found that the interview became custodial in nature only after the break, as the agent accused the traveler of "terrorist activities." *Id.* at 1110. However, the Eleventh Circuit found that the earlier portion of the interview was not custodial, concluding that "a reasonable person under the circumstances would not have believed that he was subject to a degree of restraint comparable to arrest[.]" *Id.*

*Jayyousi* is more analogous because it addresses when routine border questioning of a traveler *becomes* a custodial interrogation, whereas *McCain begins* with a custodial strip search. Here, Officer Bovi's questions were plainly within the bounds of a routine border inspection, as

he testified that he did not ask any questions that he would not have ordinarily asked during a secondary inspection. ECF No. [55] at 14:21–25, 15:1–4. In this regard, the questions asked were permissible and non-custodial questions under *Moya*. It was only when Agent Dwyer arrived and confronted Defendant about the contents of his phone that the interview extended beyond a routine encounter. Thus, considering the facts and the Eleventh Circuit's holding in *Jayyousi*, the Court finds that Defendant's separation from his luggage does not support the conclusion that he was in custody. Particularly where the *Moya* factors counsel in favor of the opposite conclusion, as discussed above, *McCain* does not control.

Therefore, the Court finds that Defendant's statement of his passcode was voluntary and was not "compelled," as contemplated by the Fifth Amendment. As a result, it does not reach the Government's arguments regarding the "regulatory regime" exception, the "routine border questioning" exception, or the inevitable discovery exception.

**C. Fifth Amendment Claim: Post-*Miranda* Confession**

Defendant's final argument is that his statements to Agent Dwyer must be suppressed because the *Miranda* warnings could not function effectively, and Defendant's statement was not voluntary. ECF No. [20] at 10. Specifically, Defendant contends that law enforcement engaged in the "question first" technique that renders a statement post-*Miranda* inadmissible. *Id.* at 10–12. In addition, Defendant argues that his statement to Agent Dwyer was not voluntary because Agent Dwyer made an implied promise of leniency. *Id.* at 12–13.

The Government responds that the test for the effectiveness of a midstream *Miranda* warning does not apply here because there was only one custodial interrogation—namely, the conversation with Agent Dwyer. ECF No. [30] at 16–17. Defendant's secondary inspection interview with Officer Bovi was not custodial, so there could not have been an improper "question

first" interrogation technique. *Id.* at 17. Moreover, the test for establishing use of the impermissible "question first" technique cited by Defendant does not apply in this circuit. *Id.* at 18–20. Finally, the Government argues that Agent Dwyer did not make an implied promise of leniency. *Id.* at 20–23.

Defendant replies that Defendant was in custody when he was questioned by Officer Bovi; as such, when Agent Dwyer continued the investigation, he was engaging in the proscribed "question first" technique. ECF No. [39] at 8. Moreover, Agent Dwyer made an implied promise of leniency, rendering Defendant's subsequent statements involuntary. *Id.* at 10–11.

As a general matter, once a subject has been provided with a *Miranda* warning, the subject's statements made during a custodial interrogation are only admissible if the Government can show that "the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991). For a waiver to be voluntary, it must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Moreover, the waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Although a signed *Miranda* waiver form is 'usually strong proof' that a suspect voluntarily waived his rights, it is not conclusive on this issue." *Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 893 (11th Cir. 2003). The Court is nonetheless required to inquire into the totality of the circumstances. *Id.*

In *Hart*, the Eleventh Circuit held that an officer's statement to a subject, after the signing of a *Miranda* waiver form, that "honesty wouldn't hurt him" "contradicted the *Miranda* warning that anything he said could be used against him in court." 323 F.3d 884, 894 (11th Cir. 2003). As

a result, the defendant's decision to waive his rights and confess was not "voluntary, knowing, and intelligent." *Hart*, 323 F.3d at 895. Instead, "[h]is decision to waive his rights and confess was the product of [law enforcement]'s deception and, as a result of [law enforcement's] contradictory statements, he did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id*.

The more general rule is that "police deception renders a suspect's statement involuntary either (1) 'where the deception took the form of a coercive threat' or (2) 'where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them.'" *United States v. Morgan*, 143 F.4th 1264, 1277 (11th Cir. 2025), *cert. denied*, 146 S. Ct. 2712 (2026) (citation omitted). The latter cases arise when an officer's deception "interfere[s] with the defendant's 'ability to understand the nature of his [*Miranda*] rights and the consequences of abandoning them.'" *United States v. Farley*, 607 F.3d 1294, 1330 (11th Cir. 2010) (citations omitted).

The Court finds that this is squarely a case of police deception regarding a suspect's rights, such that Defendant's confession during his conversation with Agent Dwyer was involuntary. There is no daylight between the statement, "Honesty will not hurt you," and Agent Dwyer's statement, "Honesty will help you," both made after the signing of a *Miranda* waiver form. ECF No. [55] at 70:13–17. Insofar as the Eleventh Circuit deems the former a "[p]olice misrepresentation[] of law" that directly contradicts a *Miranda* warning, *Lall*, 607 F.3d at 1285, the Court is bound to find that the latter is such a misrepresentation, as it goes directly to the nature of Defendant's rights and the consequences of waiving them. Defendant's ability to make a knowing, voluntary, and intelligent waiver of his *Miranda* rights was undermined, and his confession was involuntary. As such, it must be suppressed.

This conclusion is reinforced by Agent Dwyer's statements, "Honesty will help. I can talk to people, and we can figure this out," ECF No. [55] at 72:8–11, and "We'll get you out of here," *id.* at 92:7–12. The Supreme Court has stated that "a confession, in order to be admissible, must . . . not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *Bram v. United States*, 168 U.S. 532, 542 (1897) (internal quotation marks omitted). It is true that "*Bram*'s suggestion of a per se rule that would render a confession involuntary if it was preceded by 'any direct or implied promises, however slight,' has been rejected by the Supreme Court." *Lall*, 607 F.3d at 1285 (citation omitted). Instead, voluntariness remains based on the totality of the circumstances. *Id.* (citation omitted). However, "a promise of leniency may render a confession involuntary if it was sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer." *United States v. Herron*, No. 2:14-CR-23-FTM-38, 2015 WL 867309, at *20 (M.D. Fla. Feb. 4, 2015).

Here, there is no doubt that a promise of leniency was made. Agent Dwyer expressly promised Defendant that he would be let go if he provided the information sought by Agent Dwyer. A reasonable person would understand Agent Dwyer's statements to be a promise of leniency. Indeed, the Eleventh Circuit has found that a promise that a subject will be allowed to leave is a promise of leniency. In *United States v. Jones*, the detective told the defendant, "The quicker we get your information and get you processed, the quicker you are going to get home." No. 24-13797, 2026 WL 959802, at *1 (11th Cir. Apr. 9, 2026). The Eleventh Circuit determined that this was a promise, though it did not result in a finding of involuntariness in a later confession because the promise was made significantly *before* the signing of the *Miranda* waiver. *Id.* at *5.

Moreover, such a promise clearly undermined the voluntariness of Defendant's subsequent confession. The Court returns once more to the *Spivey* factors. At the point of Agent Dwyer's

promise of leniency, (1) Defendant was in custody, (2) law enforcement actively made Defendant a promise, (3) Defendant remained cooperative, though less so, as he denied possessing CSAM multiple times, (4) Defendant was aware of his *Miranda* rights insofar as he read and signed the waiver form, though his awareness had been undermined by Agent Dwyer's subsequent statements, (5) Defendant remained educated and intelligent, and (6) Defendant knew that incriminating evidence had been found. While the Eleventh Circuit embraces the "totality of the circumstances" approach, it has also made clear that a promise "may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *Lall*, 607 F.3d at 1286 (quoting *United States v. Walto*n, 10 F.3d 1024, 1030 (3d Cir. 1993)). Moreover, it is true that Defendant signed the *Miranda* waiver form before the above statements were made by Agent Dwyer. But Eleventh Circuit precedent is clear that "promises . . . undermine[]" earlier-given *Miranda* warnings, including where an individual signs a waiver form. *Lall*, 607 F.3d at 1283 (citation omitted). Agent Dwyer's promises carry significant weight in assessing the totality of the circumstances analysis, and the Court finds that the *Spivey* factors support finding Defendant's confession involuntary.

Taken as a whole, Agent Dwyer's statements—that honesty would help Defendant and that he would allow Defendant to leave—undermined the voluntariness of Defendant's waiver of his *Miranda* rights and subsequent confession. Thus, the confession must be suppressed.[2]

---

[2] Because the Court finds that Defendant's post-*Miranda* confession must be suppressed based on Agent Dwyer's misrepresentations of law and promises of leniency, the Court does not reach Defendant's arguments regarding the "question first" technique.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [20]**, is **GRANTED IN PART AND DENIED IN PART**. The confession obtained from Defendant after the reading of his *Miranda* rights shall be inadmissible in the trial of this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 29, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of record